v. O'Grady May I proceed? Just a moment. You may proceed. Thank you, Your Honor. May I please report in opposing counsel. I am Sheldon Ritchie along with Katherine Walters. We're here on behalf of Dr. O'Grady, who is the appellant, Your Honor. This court has recognized that the Husky case made a clear distinction with respect to the interpretation of, quote, actual fraud under 523 of the Bankruptcy Code. This is not just an actual fraud case. This is a case that deals with false pretenses and actual fraud. The appellee's brief focused a lot on the intent of Dr. Birenbaum. And these are both doctors, Dr. O'Grady and Dr. Birenbaum. Dr. Birenbaum needed money in 2007. Dr. O'Grady had money. Dr. O'Grady, my client, relied upon some representations that were made by Dr. Birenbaum and his financial advisors in deciding whether or not to advance money to Dr. Birenbaum for his oncology practice in Dallas and surrounding territory. Those representations and misrepresentations or false pretenses created in Dr. O'Grady a false impression about what the money was going to be used for, what the collateral was going to be for that money, what the status of the practice was, which was called Texas Hematology Oncology Centers, and relied upon that information, including the financial status of Texas Hematology Oncology Center and Dr. Birenbaum, in advancing the million dollars. Interestingly, in 2017, in a Dallas case, and this case is out of Dallas, Your Honors, a case called Huddleston, which was only reported in 2017 Westlaw 1207522, the court in that case said, in talking about Husky, that a false pretense is a written or oral misrepresentation or conduct, and that's distinct, or conduct, which creates or fosters in the proposed lender, Dr. O'Grady, or creditor, a false impression and can include a material omission. False pretenses can also be defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction in which a creditor is wrongfully induced to extend money or property to the debtor. I've asked the clerk to provide to the court this little book that you have. It's just some excerpts, because I thought it would help walk through some of the testimony that are in our briefs very quickly. It starts with, in . . . Before you get to it, just the legal framework, the Acosta decision. We are reviewing for clear error the district court's affirmance of the bankruptcy court's finding that Mr. Birenbaum, Dr. Birenbaum, didn't have an intent to deceive. That would be correct. Okay, so that's . . . But we don't think it's relevant, whether he had an intent to deceive. Well, for you to be a fraud victim, to make discharge unavailable under 523, you've got to establish that he had an intent to deceive. Under 523, we have to establish actual fraud . . . Right. . . . done by the Husky court, which doesn't include an intent to deceive. It includes some broader things. Activity, which would suggest . . . But you've got the financial carve-outs . . . I'm sorry, Your Honor. You've got the financial carve-outs in the code, and a distinct treatment of misrepresentations of financial data. Well, I think there's a difference between the financial carve-out, as you say, and the types of misrepresentations or omissions to make statements with regard to a judgment two weeks before the closing, a turnover of the stock in TEOC. TEOC was the vehicle where the money was generated to pay this money back. And TEOC gets seized by a turnover order two weeks before the closing. And some of the material we gave you, Your Honor, is that if you . . . there's some page numbers at the top, which are transcript pages, and then there's numbers at the bottom, which have to do with the . . . So your argument turns crucially on us interpreting Husky International to require actual fraud, and therefore you're saying Acosta's scienter requirement has been superseded? No. Actually, what I'm saying to you is that you can rule for us in our favor in reversing and rendering this decision based upon either the actual fraud or the false pretense. So if you look at 5 . . . And I sometimes oversimplify in area law. You may know and I don't, but Acosta seems controlling that there is a scienter requirement no matter what. And in a simple way of looking at this, the bankruptcy court heard the testimony of the two doctors, found your client to be not credible, and believed Birnbaum just inasmuch as he may have been dumb, but he didn't have an intent to defraud. He'd relied on Miller to clear things up, and Miller may have swindled everybody, but he . . . Birnbaum had a . . . you know, he's a doctor, he's not a businessman, and therefore he didn't intend to defraud. And that would be the end of the story, unless you can show that that's implausible from the record presented to the bankruptcy court. Am I wrong legally, or are you saying that the record does demonstrate that's an implausible reading? I'm saying that, first of all, I don't think you're wrong. Okay. Well, I could easily be wrong, so don't hesitate to say it. I don't think you're wrong, but I think it's nuanced. It's nuanced. Okay. Go back to the Husky decision, for example. It says, although fraud connotes deception or trickery, the term is difficult to define more precisely. And then it says, fraud being so various in its nature and so extensive in its application to human concerns, it would be difficult to enumerate all the instances in which courts of equity will grant relief under this head. There is no need to adopt a definition for all times and all circumstances here, because from the beginning of English bankruptcy practice, courts and legislatures have used the term fraud to describe a debtor's transfer of assets that, like writs, like writs of scheme, impairs a creditor's ability to collect the debt. And in writs, as this Court knows, that debtor was transferring assets for less than full value, sort of a fraudulent transfer away from the debtor to new entities that he controlled. I'm saying something a little different than that, Judge Higginson. I'm saying that actual fraud is different than fraud. I'm saying that Judge Hale's ruling and the district court's ruling were clearly wrong based upon the evidence. When you look at the totality of the evidence, you can see that he couldn't infer. He could not infer. Okay. So what's your best — And that's clear error. What's — okay. What's the best record example that proves the intent to deceive, where the bankruptcy court clearly erred? If you look at — in that book under tab 2, the reference to the record here would be to start at document 467 going through 468. It's got 54 and 55 at the top of the pages. This is Dr. Birnbaum testifying. Dr. Birnbaum. Starting with line 20, do you recall that there was a judgment entered against you in March of 2007 in favor of Mr. Martin? Do you recall that? Yes, sir. And that was for $1.3 million, I believe so, yes, sir. And after that — and that's after the financial package had been delivered to Mr. Miller and Mr. Schulich. Those are the financial representatives. I think so, yes, sir. All right. And it would be within weeks of the time that the deal with Dr. O'Grady was inked, was signed, right? I think so, yes, sir. Did you do anything to ensure that Dr. O'Grady knew that a judgment had been entered against you before signing the art purchase agreement? I gave the information to Mr. Miller, and I assume that he forwarded it to Dr. O'Grady. He goes on to then say he didn't have a direct communication with Dr. O'Grady. He could have if he wanted to. You turn to page 56, 469 in this record. Do you recall that shortly, like within a week of the time of the judgment, there was an application for a turnover — we're talking about all the stock of TEOC — for the TEOC stock to be seized? Do you recall that? Yes. Did you do anything to let Dr. O'Grady know that that had happened? Again, that information was given to Miller. What he did with it, I don't know. Well, he's — Miller is his agent. Well — But you didn't do anything to contact — You say Miller's his agent. Miller didn't testify. How — Dr. Birnbaum testified. Right. Miller did — His agents. His financial representatives. Okay. Therefore, those are his agents, and they're delivering information. Therefore, in the Trommel-Quinn-Liven case, we had to remand to establish whether there was an agency relationship under State law. How can we just infer from this there was an agency relationship? Look at page 70 in that same material, starting in line 17. And you — this is Dr. Birnbaum. And you understood that Mr. Miller was doing that work for you, was trying to get TEOC and you some money to pay your judgment and to refinance TEOC. That's correct. And you testified earlier, going back to your question, Judge Higginson, about how do we know he had an intent. Okay? And so one of the cases, Scarborough, I think, talks about the fact that the money was used for a wrongful purpose. It was a different purpose than what you said it was going to be used for. You said it was going to be used to finance TEOC. Instead, you used it to pay off a judgment that you didn't even disclose. And so that — I'm asking him about that here. Yeah. And you testified earlier you were going to use some of this money to pay off the judgment. And you did that. That's correct. And you used Dr. O'Grady's money, just some tax money, some part of each of all to pay off the judgment, didn't you? And he says Mr. Miller knew that up front, that we needed the money for the judgment and additional monies. The judgment that's not on your — But what if you made a very compelling case that he had the intent to defraud? Yes. But the district court trial judge didn't come to that inference. You've got to now make a case that it — we have — in spite of the clear air standard review, there's no way Birnbaum's answer is that Miller was going to handle the lien. Miller was going to clear up the judgment. That sounds like you're relying on law that imputes Miller's fraud to Dr. Birnbaum. Is that essential or not? I don't think so. No. OK. Because he testified — Dr. Birnbaum testified that he put together the financial packages that were delivered to Dr. O'Grady. Yeah. But after the judgment was entered in, the judgment is not on the financial statements. So Miller didn't do that. That's Dr. Birnbaum not including this material judgment of $1.3 million and the stock seizure on his financial statements, and he knew it before the closing by at least two weeks. That's not Miller. That is — Material 1.3, a lot of money, but the valuation that he offers was what, 50, 70 million? 59 million. But when you look at that financial statement, which is in No. 1, 51 million of it is from Teahawk. And then Dr. O'Grady testifies, talking about materiality, if you go over to the last tab in this book at 5, Dr. O'Grady testifies that had he known about the judgment, he would not have closed because he wouldn't advance money to anybody who wasn't paying their debts. And that's at 203 and 204, you know, 203 and 204 of the documents in this file. But the trial judge sort of in the oral reason says, I don't really believe O'Grady. He gives a million dollars to a stranger with the security being art that he's never seen. So he did make a credibility finding discrediting sort of the larger statement of O'Grady. Fair to say? Not. No, I don't think that's fair to say. Okay. I don't think he discredited him. What he said in his findings of fact, or his explanation of his judgment, was that we didn't prove materiality. He didn't say, I don't believe Dr. O'Grady that he wouldn't sign. He said, you didn't prove materiality. We think the evidence is clear on his face that it's material. And Dr. O'Grady didn't know Barenboim, but Dr. O'Grady knew Miller. That's right. Didn't he? Miller had been O'Grady's financial advisor at one point. He had sold him some financial products, so a life insurance policy and an annuity prior to that. And in connection with the agreement, the agreement for the million dollars was secured by some artwork. Is that right? It was supposed to be secured by some artwork, and there was a security. Well, that's what the agreement provided. Yes, sir. Yes. And it also provided that none of that work was to be sold. That's right. And that there was no liens on it. And in fact, there was a lien on it already. And there was some negotiations to sell some of it to somebody else, weren't there? It was not disclosed to Dr. O'Grady. It was not disclosed. And closed within 13 days of Dr. O'Grady's sale. And the lawyer that documented the deal was chosen by the financial advisors. And if you look at the security agreement, which is behind tab three, it actually says that the lawyer is representing Dr. Bierenbaum. No, I'm sorry. It's not here. It's in the art purchase agreement. It says he's representing Dr. Bierenbaum and the financial advisors, not Dr. O'Grady. So what you've got is, you know, the fact that my client may have been careless, certainly will agree to that, doesn't excuse the behavior of Dr. Bierenbaum, who was the CEO and president of TEOC, who's testified in testimony that we put before the court in our brief, that he was out doing financing on his own before Miller and Shulich, and was not succeeding. And that he knew what belonged in financial packages, and why those were there, and how important those were to the lenders to look at. And that he purposefully did — he followed the advice of his advisors, that's his choice, in not disclosing to Dr. O'Grady the fact — I have one question before you step down. What do you do with the court's finding under 523A2B with regard to the reasonableness of reliance? There are some cases, Your Honor, and I was trying to find it earlier, and I may be able to find it while I sit down. He found it. He found it false. It says it has to be something that is readily apparent to a person, given their position and their knowledge. Dr. O'Grady is a neurological surgeon. He's not a lawyer. This is a bankruptcy court finding. The litigation that resulted in the judgment was a matter of public record. It is doubtful that it was omitted to deceive anyone, as it would have been easy to determine by just conducting a search. O'Grady failed to show by preponderance the evidence the omission was made with intent to deceive. The court did not believe that the plaintiff showed that Burma acted with a requisite intent to deceive. He gave a lot of information to Mr. Miller, and Mr. Miller had access to information, not just from Burma, from others, et cetera, and he goes on. He said some of this information provided by Burma shed additional light on the issues of which the plaintiff now complained, and he frankly goes through and he says that O'Grady directly does not evidence requisite intent to deceive. Therefore, O'Grady has not met his burden of proof under A2B. Well, I think there's two questions there, Your Honor. The first one is, what do we make of the fact that Dr. O'Grady should have done more? There is a case, and I'll try to find it, that says that duty, that burden, really has to do with what's public common knowledge within the realm of the person that would be looking for it. Dr. O'Grady is a neurologist. He's not a neurosurgeon. He's not a lawyer. The fact that a judgment may be in public record doesn't mean that he would even know how to find that. Most of my clients don't know how to find that. And then the second one, with respect to whether or not Dr. Birnbaum had the intent, that only would go to the actual fraud, still not, would still not go to the false pretense. He was using the money to pay a judgment off. He admits that. He admits that. That is a violation. That is the type of thing that should not be discharged under 523. All right. Thank you, Your Honor. Thank you. All right. You may proceed. You may please the Court. I'm John Lewis. I represent Dr. Birnbaum, who is the appellee in this case. The issue for this Court to decide is, did Judge Hale, who presided over a three-day trial in his court, clearly err when he found that Dr. Birnbaum did not act fraudulently and did not intend to deceive Dr. O'Grady in the transactions? It's a clearly erroneous standard of review based on the factual findings. Judge Barbara Lynn in the District Court reviewed the record, reviewed the briefs, and concluded that there was no clear error. Dr. O'Grady is before this Court asking this Court to change that result. I would like to address the Husky decision. Husky does not save Dr. O'Grady from his failure to prove all the requisite elements for an objection to discharge in the bankruptcy case. All that the Supreme Court in Husky did was find and hold that you do not require that Section 523A2A of the Bankruptcy Code does not require an affirmative representation for an exception to discharge. The Court said you could have other fraudulent conduct, such as the fraudulent transfers in that case, to satisfy that statutory provision. And in fact, on remand to this Court, the decision of the three-judge panel was, we still have to find fraud. We still have to have fraudulent intent. The record that was before the Court on remand was insufficient to determine, were these transfers made by Mr. Ritz, made with the actual intent to hinder, delay, or defraud? You send it back to the District Court and back to the Bankruptcy Court to make those determinations. The second Court on remand in Husky referred to the Texas law of fraud. The Court stated specifically that under Texas law, intent is a fact question uniquely within the realm of the trier of fact, just as fraud, false pretenses, intent to deceive, were unique fact questions specifically to be decided by the trier of fact in this case. But if Birnbaum admits that a false representation was made by Odellene, so he's acknowledging a false statement to Dr. O'Grady, how is that not fraudulent? With respect to whether there were liens on some of it? Well, the lien, but also the money judgment, I mean, the portion that did both of them, where Birnbaum's own testimony is that a false statement was made to Dr. O'Grady in connection with the deal. We're dealing with two subsections of the bankruptcy case.  With respect to the money judgment, that comes up under Section 523A to B, the use of a written financial statement. Yes. And the question becomes, was the omission of that judgment on his written financial statement material? Was it made intentionally with the intent to deceive Dr. O'Grady? Right. So the nondisclosure equals intent to deceive. But as to the — am I wrong? As to the lien portion, it's the same question, if we're not focusing on materiality, is was there an intent to deceive. And my question to you is, when he quotes the testimony of your client saying, I knew that was a false statement, it was made to O'Grady, how can that not be intent to deceive? I thought the district court addressed that in my memory. It does address that. It does address it. What's the answer in your mind? The answer in my mind is twofold. First of all, it's boilerplate language in a security agreement. Second, we're talking 142 pieces of art where there's 1,900 total. So that — and there's no evidence as to the materiality of the 140-something pieces. Okay. So as I hear you answering it, you're saying, okay, they were false statements, but they were immaterial in the context of the larger deal. Actually, my final answer, Judge Shigginson, is the lien holder for that art, Siemens Electric, never pursued those liens. What the evidence shows is that there were lien filings, UCC statements, on that art, but that there was never any attempt by the secured creditor of record to actually seize, foreclose, or take that art. But there would have been an abandonment of the lien at a later point in time. The UCC filing would have perfected the lien, correct? Correct, Your Honor. But at the point of the transaction, the falsity was still there, right? It was there. It was of record. I thought that there was — right or wrong, the district court explanation, as his finding was, that Miller, the doctor, admitted that that was true, but he had told his agent to correct that, and he was relying on them to have done so. I don't know. So you do have a false statement there, but that is cured or not. If, in fact, that occurred and the district court found it did, is my memory correct about that? That is correct, Your Honor. Mr. Miller is the person who orchestrated this. Mr. Miller was actually Dr. O'Grady's agent, or he was acting as the agent for both parties based on prior relationship. It looked like he was his own agent. And the record is — in the record, Your Honor, you'll see where Dr. O'Grady filed a FINRA arbitration against Mr. Miller, claimed that Mr. Miller was his advisor, his financial advisor, was selling him securities, including this art transaction, and claimed that he did not do the requisite due diligence required of a security advisor, and, in fact, received an award in that FINRA arbitration. That is evidence that contradicts the agency or solely relying upon what Dr. Bierenbaum may have said. I just want to make sure I understand. So you're admitting to one falsity, but the explanation is it's boilerplate language. So if something happens to be false in a particular — as regards a particular agreement, then it's excusable because it's boilerplate language. That's what was found below when you're saying that's correct. No, that's not what I'm saying. That wasn't the finding below? That's how you interpret it. That wasn't the finding below? Well, it was just boilerplate language. It was false, but it was boilerplate. We admit that the security agreement said there were no prior lands. And we agree that that was incorrect because of the filings. You're calling it incorrect. I'm calling it false. We won't argue about that. Okay. We call it false. All right. But the court went on to find that, one, it was not material based on the artwork at issue. And, two, the court went on to say that it was not a justifiable reliance. There was nothing about boilerplate, about it just being boilerplate language. That wasn't part of the justification. I don't think that's in Judge Hale's — All right. And it was immaterial because — Because there was no evidence that the art that had liens according to — Well, justifiable is not the correct standard, is it? Justifiable is the correct — Not justifiable, is it? No. Justifiable is the correct standard for 523A, the fraud. Reasonable is the standard for the financial statements. Yeah. And Judge Hale correctly applied both those standards on both of those issues. Well, I want to talk about the artwork because you're saying that it was immaterial because it didn't apply to all of the artwork or only some of the pieces. Is that what you're saying? Fair word. That is correct, Your Honor. 1,900 pieces. Well, but didn't the agreement provide that he wasn't to sell any of the artwork? I think I know what any means. Isn't that what the agreement says? I believe it did, Your Honor. And despite that, he was in negotiations to sell some of the artwork at the time he executed his agreement, wasn't he? The evidence is, and Dr. Birnbaum testified, that he believed he was borrowing more money from a separate person and pledging the artwork. And that his — Say that again. Dr. Birnbaum's testimony is, first of all, this is allowed from Dr. O'Grady. I'm pledging art. And I have $3 million, $4 million worth of art. I'm borrowing a million. Mr. Miller is also arranging for another loan from another company for another million dollars, and we're going to pledge the same artwork. And I can do that, according to Mr. Miller, because I've got so much value in the art. Well, then, don't you need to take the word any out of the agreement where you're saying you're agreeing not to sell or encumber any of the artwork? Couldn't you cure that just by being specific? You could, Your Honor. It didn't happen in this case, however. Well, they were specific about the pieces of art, weren't they? Didn't they have, like, an inventory list? No. No, in fact, if you read Judge Haley, see, one of the reasons that I find a lot of this incredible is there's no description of any of this art on the art purchase agreement. There's 1,900 pieces in four locations but no item. The things you would do if you're really buying art or loaning against art or whatever. That brings us to another test, and that is, was there a loss caused by whatever Dr. Berenbaum or Mr. Miller did? And Judge Hale found that there's no proximate causation of all of this conduct with respect to Dr. O'Grady's loss. Well, a loss is the determination that the debt is dischargeable. Doesn't that result in a loss to Dr. O'Grady? Well, I just, I don't. If the bankruptcy judge discharges the debt in bankruptcy, he loses a million dollars. That is a loss. That's a loss. Why did we lose money, and that's because? Well, he lost money because the judge said there was no fraud or no intent to deceive. Isn't that right? That's one of the reasons he lost money, Your Honor. Correct. He lost money because if he had perfected his own liens on that artwork, here's a million dollars on Monday. Monday afternoon, I have a UCC1 on file. I would be the senior creditor with a lien on all of that art, and I could follow that art everywhere it went, whether it was loaned again to the Houston people, whether it was sold. That was the reason that there was no lien on the art of the bankruptcy. But in the agreement providing either or, either he could seek recovery of his money or the art. Isn't that what it said? The agreement, as Judge Hale says, is peculiar. It said I'm going to buy the art, or I have an option to buy the art, or if I don't want to buy the art, I get my million dollars plus $150,000. Again, if we go back to the district court, there's a usury issue. Is there even a debt that Dr. O'Grady is owed because of the double usury? You know, the good bankruptcy judge struck me as applying a pretty demanding standard. He's a very busy surgeon, and doctors and surgeons are notorious for not being so attentive. They're so busy doing what they should do in practice of medicine, they don't keep up with some of it. But he insisted, throughout his findings, he insisted that he was being unreasonable and naive, whatever, et cetera, et cetera. If that's really the driver here, I'm not sure that the question of reasonableness is defensible. What's reasonable reliance? It's a reasonable person. Anybody else? I guess you're requiring me to have a little more sophistication, business sophistication, a little more careful, not be too trusting. The question about the doctor. Look, the doctor handed out a million dollars. We're going to check for a million dollars, and he didn't do a darn thing except rely on this advisor, sometime advisor, and they didn't check anything. They didn't even perfect the lens on that arc, and they didn't do anything like that. From his perspective, that doesn't answer the case, but I'm focusing on the judge's approach to the question of justifiable reliance, et cetera. When you look through the lens of the people who were dealing with him, they're dealing with a very busy surgeon who's not being attentive to the details, et cetera. And why doesn't that factor into the question of justifiable reliance? The whole thing strikes me as being quite odd in that regard. Well, to rely, I think Dr. O'Grady, one, he had Mr. Miller, who he thought I believe at that time was actually representing him, bringing him an investment, and he sued for you didn't do your due diligence, claiming in an arbitration that you owed me these duties and I'm relying on you. So there's one. Two, there's evidence at trial where Dr. O'Grady, in a totally unrelated transaction at or about this same time, sends $400,000 to the girlfriend of Mr. Miller at the spur of the moment because he was promised a high-yield investment, and Dr. O'Grady never ever learned what that investment was, what it was supposed to be. It was referred to as Team Two, and that shows the type of decision maker that Dr. O'Grady is. He might be a brain surgeon. He's easy pickings with it. But when it comes to making, if he wants, if he thinks he's got a high yield or a high return, he will send his money, maybe overly trusting of Mr. Miller, and that had nothing to do with Dr. O'Grady, I mean Dr. Bierenbaum. Well, you, you, Miller, they point out Miller is the agent of Dr. Bierenbaum, and then they cite case law in the 523 context, that Quinn-Liven case and Rinkler, that therefore Miller's frauds can be attributed to your client. You didn't cite or respond to those two cases. Would you do that now? I believe the evidence is that Miller acted for both parties, factually, and that Judge Hale, in reviewing the evidence, viewed Miller as being. So he was acting on Dr. O'Grady's behalf when he decided not to tell him about the judgment? Yes, Your Honor. Explain. He made the decision as to what Dr. O'Grady needed to know or should have known or wanted to know, as evidenced by the fact that Dr. O'Grady sues Mr. Miller for not telling me about that, for not doing your due diligence, for getting me into this transaction. Well, and Dr. Hale's ruling to me makes sense then if Swindler, if Swindler, if Miller is the Swindler of both doctors, but you didn't cite or respond to the case law that they offered, that Miller here is an agent, hence necessarily his false statements are attributable back to the principal. So if you know those cases, Quinlivan and Rinkler, I'd love some discussion of them. Your Honor, I didn't focus on those. I'm not sure I'm prepared to. Okay. But then what about the general proposition that if Miller is Dr. Birnbaum's agent, then Birnbaum can't say, well, I counted on Miller to correct my false statements, which seemed to me to be essential to the Dr. Hale's finding. I think Judge Hale, I believe that Mr. Miller, what Judge Hale says is that Dr. Birnbaum provided a lot of information to Mr. Miller. Good and bad. And that Mr. Miller may or may not have forwarded that on or shared it with Dr. O'Grady. Right. However, Dr. Birnbaum did not have the requisite fraudulent intent. Right. And these two cases, to me, say whether he did or didn't have that intent. If his agent did, it's imputable to him. Well, again, I don't think Judge Hale didn't rule upon whether Mr. Miller had fraudulent intent or not had fraudulent intent. That's true. Okay. Again, the whole context of what's the fraudulent intent? Fraudulent intent arguably is I'm going to get a million dollars, I'm never going to pay you back. Well, the evidence at trial is I'm going to be borrowing a million dollars. You're either going to get the art or you're going to get $1,150,000 back in 90 days. And here's a lien, here's a security interest in the art to secure that. And it's not our fault you didn't go out and file your UCC-1 and protect yourself. The evidence at trial was that this was to be short-term financing because Mr. Miller had promised Dr. Birnbaum I can do this global financing. I can raise $20 million to take care of not just this $1 million judgment issue, but all of your other issues with Siemens and banks and so forth. And when we get that in, we're going to pay back Dr. O'Grady and anyone else. Are you saying that the fraud would require an intent on the very front end that I'm never going to pay you back? I think so, Your Honor. So it wouldn't just be an intent that I'm going to fraudulently induce you to make me the loan? That's correct, Your Honor. I think you have to have an intent not to repay it. Not to ever pay it back. Because, again, under the Bankruptcy Code, we don't accept the debt from discharge unless it's because of money or property you received due to fraud, fraudulent misrepresentations or false pretenses. And this Court has said you've got to have moral turpitude. You've got to have this intention to conduct. And our position is if you intend to pay it back — It doesn't matter if you use fraud to induce me to make the loan as long as I intend to pay it back. Your Honor, fraud in my mind — If you give me this million dollars, I'm going to take it and turn this business around, and then I'll be able to pay you back. I just need to trick you into giving it to me. Your Honor, I think the Texas standard for fraud is you've got to have misrepresentations or misstatements. You have to have this intent to deceive. In other words, you're not going to pay it back. I think fraud presumes that I'm not going to pay it back or I'm taking it from you and I'm not entitled to it. I think you negate the standard. Or I'm taking it from you and I'm not entitled to it. Is that what you're saying? Yes. All right. All right. Your time has expired, counsel. Thank you very much. Rebuttal? Well, first let me respond that the fraudulent intent here — He said he was using the funds for TEOC, to put in a TEOC, and then he testifies that he used it to pay a judgment that he didn't even disclose existed. So we have a false statement made at the very beginning with respect to what I'm going to do with the money when I get it. In Husky — this is from Huddleston, but it was in Husky that they're referring to — false pretenses can also be defined as any series of events when considered collectively that create a contrived and misleading understanding of a transaction in which a creditor is wrongfully induced to extend money. So it has nothing to do with whether or not I intend to pay. It's a series of events. And here we've got false financial statements, we've got liens that exist that are not disclosed, but most importantly we've got a judgment in place with a turnover order two weeks before the closing that I don't even know if it was docketed or not two weeks before. But Bierenbaum says he knew about it and that that's why he needed the money to pay it off to save TEOC and didn't disclose any of that to Dr. O'Grady. Then there's a question that came up about who is Miller and Shulick representing. At 500 of the docket entries here, which is page 87 in this book under tab two, I asked him about Miller and Shulick. And you were not communicating to Dr. O'Grady about the turnover because you had that discussion with Miller about whether you should communicate with Dr. O'Grady. He told you don't do that. And he says him and Shulick. And you followed that instruction. Answer. They were the brokers. They were the ones representing me. That's Bierenbaum. That's not me saying those were his agents. That's Bierenbaum saying they represented him. So this question of whether they were representing O'Grady and they were representing Bierenbaum, there is nothing in the record to suggest they were representing O'Grady in this transaction. But even if that was true, there's conflict of interest in joint representation or they were representing Dr. Bierenbaum. And they made false representations by failure to disclose the material event. Why is it material? Because O'Grady testified that had he known about it. Did you make this argument to the bankruptcy judge? Yes, I did. You made the agency argument? Yes, I did. And I would say with respect to that, Judge Hale did not make a finding one way or the other on agency. It's just not in his findings. Sorry, I didn't hear you. Judge Hale did not make a finding, a fact finding on agency. And there was none requested by the respondent. And so if their defense is, well, those representations are not our representations, which just isn't true of agency anyway. But you're the one, I mean, it was helpful. You cited the Quinn Liven case. There we remanded to have that fact finding made. And that may be one of the things you do. I don't think that you need to do that. I think here it is clear that there is no evidence other than Miller and Shuler were acting on behalf of Dr. Birnbaum. There's no evidence other than there was a judgment and a turnover order that was not disclosed. It was intentionally not disclosed. And here Dr. Birnbaum says, I discussed disclosing it with Miller and Shuler, and they told me not to. So for him to say I'm relying on them wholly, and I went on in this transcript to say you could have. You could have picked up the phone and called him. You didn't do that. Miller doesn't testify. And was Miller obtaining half a million from O'Grady for his girlfriend in evidence? No, that's not. It's not true. What happened was is that Miller and Shuler came back to Dr. O'Grady's office manager while he was out of the country and said we would like an additional $400,000. Dr. O'Grady testified he believed he approved it, and he believed it was for Dr. Birnbaum, additional money for Dr. Birnbaum. But it ends up with Miller's girlfriend. It ends up in a bank account that is controlled by Miller's girlfriend. You can't see that on the wire transfer when we subpoenaed the bank records. That's where it ended up. He did not do that. I'm not going to tell you that Dr. O'Grady couldn't have done more. Of course he could have done more. The question is, is Dr. Birnbaum entitled to rely on that to avoid non-dischargeability for a clear misrepresentation of a material fact at the front end with respect to the art, where he said I'm going to pledge all the art and I won't sell any of it, and with respect to not disclosing the tax deal. And then most important is judgment. Having a judgment and having a turnover order. The judgment by itself is bad. The turnover order is huge. And the fact that you're going to use the money to pay off the judgment that you didn't disclose is material. We do not believe that it requires, even in Husky, this is from. Your time has expired. You have a moment. Thank you. In a case in the Eastern District of Sherman Division, Eastern District of Texas, in March of this year, this is another case called Mandel, the court said Husky addressed the issue whether actual fraud requires a misrepresentation. In reaching its conclusion, the Supreme Court and Husky observed that fraud connotes deception and trickery generally. End of the quote. There's no intent stated there. And I think this fraud in the bankruptcy code is different than financial fraud, for example. It includes trickery. It includes deception. It includes nondisclosure. How do you have innocent trickery? I don't think you can. But I think we've got plenty of proof of the intent here. Thank you. Thank you, counsel. May we be excused? You're excused.